# In the United States Court of Federal Claims

No. 18-695C
(Filed Under Seal:  July 20, 2018)
(Reissued for Publication:  August 13, 2018)[*]

*************************************

| | |
|---|---|
| PRICE GORDON SERVICES, d/b/a VETERAN NATIONAL TRANSPORTATION, LLC,        Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br>        Defendant. | Postaward Bid Protest; Motion for Discovery; Cross-Motions for Judgment on the Administrative Record; Effective Judicial Review; Mandatory Wage Withholding; Termination for Cause; Bias; Bad Faith; Improper Evaluations; Unstated Evaluation Criteria; Failure to Follow Solicitation Instructions; Past Performance History; Price Realism; Price Reasonableness |

*************************************

Joseph A. Whitcomb, Denver, CO, for plaintiff.

Nathanael B. Yale, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Chief Judge

In this postaward bid protest, plaintiff Price Gordon Services (d/b/a Veteran National Transportation, LLC) alleges that the United States Department of Veterans Affairs ("VA") acted in bad faith and demonstrated bias in improperly evaluating its technical capabilities and past performance in connection with a solicitation for certain transportation services. Before the court are plaintiff's motion for discovery and the parties' cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"). For the reasons explained below, the court denies plaintiff's motion for discovery, denies plaintiff's motion for judgment on the administrative record, and grants defendant's cross-motion for judgment on the administrative record.

---

[*]  The court issued this Opinion and Order under seal on July 20, 2018, and directed the parties to submit proposed redactions. This reissued Opinion and Order incorporates the redactions proposed by the parties, with some nonsubstantive typographical changes. All redactions are indicated by a bracketed ellipsis ("[. . .]").

# I. BACKGROUND

In Southern Arizona, the VA utilizes contractors to provide veterans with transportation to and from medical appointments.[1]  AR 63.  From May 2015 through approximately May 2017, plaintiff provided these services under Contract VA258-15-D-0037 (the "prior contract").  Id. at 624.  Following termination of the prior contract, see id. at 41-42, four contractors began providing the transportation services under blanket purchase agreements, id. at 164, 176.

On August 3, 2017, the VA issued Solicitation VA258-17-R-0070 to obtain transportation services for a base year and four option years from October 1, 2017, through September 30, 2022.  Id. at 78, 83-88.  Proposals were due on August 30, 2017.  Id. at 78.  The contract was awarded to Owl, Inc. ("Owl") on October 26, 2017, with a November 1, 2017 effective date.  Id. at 909.  Plaintiff lodged a size and status protest on October 30, 2017, id. at 968, and obtained a stay of performance of the awarded contract, id. at 1112.  Plaintiff then protested the award at the United States Government Accountability Office ("GAO") on November 13, 2017.  Id. at 1457.  Two weeks later, on November 27, 2017, the VA issued a notice of corrective action, indicating that it would cancel the award to Owl and reevaluate proposals.  Id. at 1604.  The GAO then dismissed plaintiff's protest as academic on December 4, 2017.  Id. at 1612.  Following the reevaluation of proposals, the VA awarded Contract 36C25818D0031 (the "new contract") to Owl on January 6, 2018.  Id. at 1860.  Plaintiff protested the award at the GAO on January 12, 2018.  Id. at 1958.  That protest was denied on April 16, 2018.  Id. at 2863.  This action followed.

## A. The Prior Contract

### 1. Performance

Consistent with the small business set-aside nature of the prior contract, id. at 21, plaintiff is a service-disabled, veteran-owned small business, id. at 584.  Plaintiff, then known as LMC Medical Transportation, began performance of the prior contract in May 2015.  Id. at 624.  The purpose of the contract was to provide "pre-arranged, non-emergency, lie-down, wheelchair[,] and ambulatory transportation services" to VA beneficiaries on an as-needed basis twenty-four hours per day, 365 days per year.  Id. at 21.  With respect to unscheduled trips, the contract required plaintiff to provide transportation within forty-five minutes of notification, including furnishing alternative transportation if necessary.  Id. at 2940.  If plaintiff was unable to do so, the VA could obtain alternative transportation and bill plaintiff for any costs in excess of the contract rate.  Id.  Otherwise, if the VA agreed to accept a late pickup, plaintiff would only receive 75% of the contract price for that particular trip.  Id.  Plaintiff was required to provide transportation for unscheduled trips no later than one hour after notification 100% of the time to receive a favorable past performance rating.  Id.

---

[1]  The facts in this section are derived from the administrative record ("AR"), relevant statutes and regulations, publicly available court filings, and matters of which the court may take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence.

On March 28, 2016, contracting specialist Eric Auffhammer contacted Tracy Beasley, then plaintiff's president, regarding exercising the first option year of the prior contract.  Id. at 2937, 2940.  Mr. Auffhammer emphasized that "[t]he timely pickup of veterans is one of the most important parts of [the] contract," and expressed concern that plaintiff "ha[d] been picking up and dropping off patients late on a regular basis," including "as many as 5-10 late pickups a day exceeding an hour."  Id. at 2940; see, e.g., id. at 2932 (listing six late pickups on March 24, 2016).  Mr. Auffhammer reminded Mr. Beasley of the contractual requirements regarding late pickups, requested a corrective action plan addressing pickup and delivery, and asked for a face-to-face meeting to share concerns and "start taking the necessary steps to address these contractual issues."  Id.  Plaintiff provided a two-page quality control plan the following day.  Id. at 2942-43.  On the evening of April 19, 2016, plaintiff's program manager resigned.  Id. at 2937.  The next day, Mr. Beasley designated one of plaintiff's employees as an interim point of contact with the VA until a permanent replacement for plaintiff's program manager could be named.  Id.  The VA expressed concerns regarding the new point of contact, who was a dispatcher for plaintiff.  Id. at 2936-37.  The confusion resulting from the turnover resulted in a late pickup and a cancelled appointment.  Id. at 2935-36.  Mr. Beasley informed the VA that plaintiff was in the process of hiring additional staff to prevent additional late pickups.  Id. at 2933.

On May 5, 2016, Mr. Auffhammer uploaded an evaluation of plaintiff's performance during the first year of the prior contract to the Contractor Performance Assessment Report System ("CPARS").  See generally id. at 1814-15.  Mr. Auffhammer rated each element of plaintiff's performance as "Satisfactory" from among the available options—Exceptional, Very Good, Satisfactory, Marginal, and Unsatisfactory.  Id.  In other words, plaintiff's performance "[met] contractual requirements [with] some minor problems for which corrective actions taken by [plaintiff] appear[ed] or were satisfactory."  Id. at 1814.  Mr. Auffhammer concluded that, as of the evaluation date (i.e., May 5, 2016), he would recommend plaintiff for similar future contracts.  Id. at 1815.

On May 27, 2016, contracting officer Daniel Thiel issued a letter of concern to plaintiff in which he emphasized:

> Since the end of March there has been a steady stream of complaints concerning late transportation culminating in yesterday the [VA] having to obtain 12 alternative modes of transportation as patients were left without transportation to their homes for in some cases up to 5 hours [and] four additional transports occurring as of this letter.

Id. at 2945.  Mr. Thiel stressed that the VA was concerned regarding plaintiff's ability "to fulfill its contractual requirements moving forward," and requested a corrective action plan.  Id.  Mr. Thiel noted that, because over 30% of plaintiff's fleet was inoperable, the corrective action plan should address the health of plaintiff's operating fleet.  Id.

Nicholas Price, plaintiff's owner, responded to Mr. Thiel on June 2, 2016.[2]  Id. at 2949.
Mr. Price averred that he had been unaware of the problems due to a breakdown in
communication, reported that a Texas state court had recently given full control of plaintiff to
Mr. Price and "barred [Mr. Beasley] from interfering in any way with [plaintiff's] business
matters,"[3] assured Mr. Thiel that he (i.e., Mr. Price) had been "working diligently" since the
Texas state court order to get plaintiff "back on track," and promised to "increase the number of
site visits in order to thoroughly evaluate the management and immediately make any other
necessary changes."  Id.

Mr. Thiel responded the following day to indicate that Mr. Price's corrective action plan
was incomplete and nonspecific.  Id. at 2947.  Mr. Thiel suggested that Mr. Price may not have
understood "the seriousness of the situation," which was the VA's fundamental "concern with
[plaintiff's] ability to meet the contract's requirements" as a result of the VA "having to
intervene on multiple occasions."  Id.

One of plaintiff's outside counsel provided a detailed plan in response to Mr. Thiel's June
3, 2016 letter.  See generally id. at 2950-51.  As part of that plan, plaintiff's counsel noted the
following statistics:

- plaintiff performed 3,470 pickups in May 2016, including 62
  late or failed pickups, for an on-time rate of 98.2%;[4]

- from the beginning of 2016 through early June,[5] plaintiff had
  averaged 3,914 pickups per month; and

---

[2]  The letter is incorrectly dated May 2, 2016.  Compare AR 2949 (response letter), with
id. at 2947 (transmittal of the response letter).

[3]  The docket sheet for LMC Medical Transportation, LLC v. Tracy Beasley, No.
16-DCV-232419 (268th Dist. Ct. Fort Bend County, Tex. filed May 16, 2016), reflects a May 31,
2016 hearing on an application by Mr. Price for a temporary restraining order.  According to
plaintiff's counsel, Mr. Beasley forged Mr. Price's name on a Texas Secretary of State filing,
used the forged filing to open a checking account, accessed SAM.gov and diverted all of the
company's money to that checking account, and then moved those funds to his private checking
account.  AR 2950.  Plaintiff's counsel reports that on May 31, 2016, a Fort Bend County, Texas
judge "restor[ed] control of the company and its resources to the proper [service disabled
veteran] owner," Mr. Price.  Id.

[4]  Plaintiff's counsel incorrectly reported the deficiency rate as 1.7%, AR 2950, rather
than 1.8%.  The difference is immaterial for purposes of resolving the instant motions.

[5]  Plaintiff's counsel's response is undated.  See AR 2950-51.  However, the response
refers to June 2, 2016, as a past date and June 13, 2016, as a future date, id. at 2950, and
therefore is presumed to have been written between those two dates.

- plaintiff averaged 130 pickups per day,[6] compared to 60 per day as referenced by Mr. Thiel.

Id. at 2950.

On September 13, 2016, one of plaintiff's drivers was struck from behind by another vehicle while transporting a patient. Id. at 2962. The patient did not report any injuries at the time, id. at 2959, 2962, but contacted the VA two days later for assistance with accident-related injuries, id. at 2960. Plaintiff failed to notify the VA of the accident prior to the patient's request, in contravention of the contractual requirement to submit all such reports within twenty-four hours. Id. at 2959-60. Plaintiff forwarded its internal report to the VA on September 16, 2016, and was asked to remind its staff that any incidents while transporting patients needed to be reported to the VA within twenty-four hours in accordance with the contract. Id. at 2956-60.

On October 24, 2016, a patient was injured while being transported to an appointment. Id. at 2977. The contracting officer's representative then performed a file audit and discovered that the training records for several of the drivers were insufficient and not in accordance with plaintiff's contract proposal. Id. at 2977-78. On November 14, 2016, the VA requested a corrective action plan regarding driver training. Id. at 2978. Mr. Price timely submitted a corrective action plan on November 28, 2016. Id. at 2952-53. On December 6, 2016, contracting officer Nathan McCoy recognized that plaintiff's response was "timely and contained proposed measures to emphasize and improve safety," but advised plaintiff that the measures required more "urgency . . . to immediately mitigate/eliminate the risk of any additional harm to our patients." Id. at 2954. Mr. McCoy imposed specific deadlines with respect to driver training, driver certification, and updating plaintiff's employee handbook, and requested a "monthly review of Driver/Attendant qualifications" moving forward. Id. He cautioned that "[p]oor performance within [plaintiff's] control and purview may result in a cost decrement, less than favorable past performance ratings, [a] combination of both, [or] other corrective actions." Id.

## 2. Subcontractor Payment Disputes

Plaintiff engaged Arizona Medical Transport, LLC (d/b/a Arizona Medical Transit, LLC) ("Arizona Medical Transit") as a subcontractor on the prior contract from its inception on May 1, 2015, through September 10, 2015. Pet. ¶ 5.5, Price Gordon Servs., LLC v. Ariz. Med. Transp., LLC ("Ariz. Med. Transit"), No. 16-DCV-234549 (240th Dist. Ct. Fort Bend County, Tex. Aug. 12, 2016). During the performance of the subcontract, a payment dispute arose between plaintiff and Arizona Medical Transit. Id. The dispute culminated in plaintiff filing suit against Arizona Medical Transit on August 12, 2016, seeking a declaratory judgment that it was not obligated to

---

[6] Plaintiff's counsel incorrectly reported the average number of daily pickups as 150, AR 2950, rather than 130. The difference is immaterial for purposes of resolving the instant motions.

pay certain invoices issued by Arizona Medical Transit. Id. ¶ 6.2. The suit was dismissed with prejudice on October 18, 2016. Ariz. Med. Transit, No. 16-DCV-234549 (240th Dist. Ct. Fort Bend County, Tex. Oct. 18, 2016) (order dismissing case).

Approximately one year prior to the lawsuit, on August 27 or 28, 2015, representatives from Arizona Medical Transit; Gentle Care Transport, Inc. ("Gentle Care"), another of plaintiff's subcontractors at the time; and a third contractor (whose role is unclear) met with Mr. Thiel and other Southern Arizona VA officials, including the Associate Director, "to discuss [their] concerns regarding [plaintiff]." AR 2986-88. On August 31, 2015, Mr. Thiel issued a letter of concern to plaintiff regarding allegations from Arizona Medical Transit and Gentle Care that plaintiff had unpaid invoices totaling approximately $170,000. Id. at 2991. In response the next day, Mr. Beasley (who was still in control of plaintiff at the time) asserted that plaintiff's subcontractors "ha[d] been consistently paid" and that the outstanding invoices were due to a "lack of personnel it requires to process billing information and communication." Id. at 2993. He averred that the concerns with Gentle Care would be quickly resolved with additional staff, faster processing, and increased communication. Id. at 2994. Mr. Beasley also averred that Arizona Medical Transit's grievance stemmed from being unhappy with its trip volume, and that plaintiff planned to pay the amounts owed and sever ties with Arizona Medical Transit. Id. at 2995. Mr. Thiel replied that because the VA did not have privity of contract with either Arizona Medical Transit or Gentle Care, his primary concern was continuity of operations should either subcontractor cease performance. Id. at 2993.

Shortly thereafter, on September 11, 2015, Ana "Bertie" Lozano, Arizona Medical Transit's chief executive officer, lodged a complaint through the VA Inspector General Hotline regarding approximately $71,000 in alleged unpaid invoices.[7] Id. at 2983-87. Ms. Lozano followed up with the Associate Director and Mr. Thiel on October 1 and 26, 2015, and met with both of them on November 3, 2015. Id. at 2989. At that meeting, she was "informed that the [VA] has no privity of contract with [Arizona Medical Transit]" and that Arizona Medical Transit needed to "work with [plaintiff] through the terms of their contract or through legal measures" to resolve the dispute. Id. In the meantime, on October 8, 2015, Ms. Lozano sought assistance from United States Senator John McCain, who forwarded her concerns to the Director of the Southern Arizona VA on October 29, 2015. Id. at 2979-82. After reviewing the matter with the Southern Arizona VA's contracting authority, the Director responded to Senator McCain's office on January 20, 2016, and highlighted the fact that Ms. Lozano's dispute with plaintiff was "outside the [VA's] purview" because it was "a contractual issue" between the two private parties and should be resolved accordingly. Id. at 2988-90.

On April 28, 2016, Gentle Care requested a meeting with Mr. Thiel regarding its difficulties in securing payment, and asked if the VA could simply pay Gentle Care's invoices

---

[7] The record does not reflect the results of Ms. Lozano's complaint against plaintiff. However, the Southern Arizona VA asserted that, despite not having "received any inquiries from the [VA Inspector General] regarding" Ms. Lozano's complaint, it had nevertheless internally addressed the issues raised therein. AR 2988.

directly and reduce payments to plaintiff accordingly.  Id. at 2998.  In response, Mr. Thiel emphasized that the VA could not get involved in the dispute because the VA was not a party to the contract between Gentle Care and plaintiff.  Id.  Approximately one month later, on May 31, 2016, another subcontractor, A-Vet Transportation, warned Mr. Thiel that it had not been paid by plaintiff at all since April 22, 2016, having only been partially paid since March 2016, and noted it would be retaining legal counsel as its "only avenue in getting paid for services rendered."  Id. at 2999.

### 3.  Wage Payment Dispute

In September 2016, the United States Department of Labor ("DOL") notified plaintiff that it was investigating plaintiff's compliance with the McNamara-O'Hara Service Contract Act of 1965 ("SCA"), 41 U.S.C. §§ 6701-6707 (2012).  AR 46.  As relevant here, the SCA requires contractors to pay prevailing wage rates and fringe benefits as determined by the DOL ("SCA wages") "to an employee engaged in performing work on the contract."  41 U.S.C. § 6704(a); accord AR 46.

To comply with the SCA, plaintiff had "segregated hours worked for the VA from hours it was not working for the VA, i.e.[,] when drivers and attendants were not performing a Unit of service the VA contracted to pay for."  AR 46.  However, according to plaintiff, the DOL "asserted that segregating hours as VA hours and non-hours was impermissible."  Id.  In other words, plaintiff's understanding of the DOL's position was that plaintiff "must pay Federal prevailing wages even when [plaintiff's] employees are not providing a per Unit service to the VA."  Id.  On April 17, 2017, the DOL directed the VA to withhold contract funds from plaintiff until the the difference between SCA wages and non-SCA wages as alleged by the DOL—$459,451.09—had been paid.  Id.  The VA notified plaintiff of the mandatory withholding on April 21, 2017.  Id.  Plaintiff then filed suit in this court on April 28, 2017, seeking an injunction preventing the VA from withholding contract funds as directed by the DOL.  Compl. Request for Relief, Veteran Nat'l Transp., Inc. v. United States, No. 17-579C (Fed. Cl. Apr. 28, 2017).

On June 6, 2017, the DOL (through its Wage and Hour Division Administrator) filed an amended complaint with its Office of Administrative Law Judges.[8]  See generally AR 2269-75. The DOL alleged that $459,451.09 in back wages owed to plaintiff's employees for the period from August 15, 2015, through October 8, 2016, had been withheld from VA contract funds owed to plaintiff and that an unspecified amount of additional back wages since October 8, 2016, was also due.  Id. at 2274.  The DOL also alleged that plaintiff, Mr. Price, and Mr. Beasley were subject to debarment as a result of their SCA violations.  Id. at 2270, 2274-75.  On June 23, 2017, plaintiff moved to dismiss its April 28, 2017 suit in this court, and the motion was granted. Veteran Nat'l, No. 17-579C (Fed. Cl. June 23, 2017) (order dismissing case).  According to plaintiff's counsel, the DOL administrative proceedings have not concluded.  See Pl.'s Mot. J. Administrative R. ("Pl.'s MJAR") 8 (stating that posthearing briefs were due on July 11, 2018).

---

[8]  The original complaint was filed on June 2, 2017.  AR 2275, 2282.

### 4. Termination

In the meantime, the VA's withholding of contract funds pursuant to the DOL directive strained plaintiff's operations.  As a result, plaintiff was unable to pay its employees after April 28, 2017.  AR 45.  By May 19, 2017, plaintiff's drivers began not performing transportation services, prompting contracting specialist Nick Lebano to issue a Cure Notice to plaintiff.  Id. at 43-44.  In the Cure Notice, Mr. Lebano noted that plaintiff's nonperformance caused "cancellation of numerous patient appointments" and that the situation "appear[ed] to be directly related" to the DOL investigation regarding SCA wages.  Id. at 43.  Mr. Lebano stated that the failure to perform transportation services was unacceptable and provided ten days for plaintiff to resume performance to avoid a default termination.  Id.

Plaintiff's counsel responded to the Cure Notice on May 30, 2017.  See generally id. at 45-47.  Plaintiff's counsel agreed that the VA's withholding of contract funds caused plaintiff's nonperformance, and averred that plaintiff was not liable for default because the VA had unilaterally decided not to pay plaintiff's outstanding invoices.  Id. at 45.  Plaintiff's counsel remarked that plaintiff paid its employees SCA wages when working "VA hours," and stated that plaintiff would not provide further transportation services until its outstanding invoices were paid.  Id. at 46.

Mr. Thiel issued a Show Cause Notice to plaintiff on June 1, 2017, emphasizing that it had become "necessary to determine whether [plaintiff's] failure to perform [the prior contract] arose from causes beyond [plaintiff's] control and without fault or negligence on [plaintiff's] part."  Id. at 48.  He gave plaintiff the opportunity to "present, in writing, any facts bearing on this question."  Id.  Mr. Price timely submitted a response on June 7, 2017, and restated the same facts identified in plaintiff's counsel's May 30, 2017 response to the Cure Notice—that the VA's withholding of funds caused plaintiff's nonperformance, that plaintiff's drivers had not been paid since April 28, 2017, that plaintiff would not be liable for default because its nonperformance was caused by the VA acting in its contractual capacity, and that the DOL's administrative complaint regarding SCA wages was meritless because plaintiff had "segregated hours worked for the VA from hours it was not working for the VA."  Id. at 49-50.

On June 15, 2017, Mr. Thiel issued a contract modification "to formally terminate for cause" the prior contract.  Id. at 41.  He referenced the VA's Cure Notice, the VA's Show Cause Notice, and plaintiff's responses to each, and explained that the contract was terminated for cause because plaintiff was "unable to provide the required services and comply with the contract terms and conditions."  Id. at 42.  Finally, Mr. Thiel notified plaintiff that it had the right to appeal the termination decision pursuant to Federal Acquisition Regulation ("FAR") 33.211.  Id.  Plaintiff did not do so.

Following the default termination, four contractors—including Arizona Medical Transit and Power Arizona LLC—began providing transportation services under blanket purchase agreements (the "bridge contracts").  Id. at 164.

### B.  Solicitation of the New Contract

On August 3, 2017, the VA issued Solicitation VA258-17-R-0070 to procure transportation services for the Southern Arizona VA Health Care System in accordance with the Performance Work Statement ("PWS") attached to the solicitation.  Id. at 78.  The solicitation was designed as a firm-fixed-price, indefinite-quantity, 100% set-aside for service-disabled, veteran-owned small business concerns.  Id. at 78, 96, 126.  As with the prior contract, the "primary objective" for the new contract is to "transport veterans to and from VA medical appointments."  Id. at 107.  Specifically, the awardee would "provide safe and comfortable door-to-door ambulatory, wheelchair, and stretcher transportation services to eligible beneficiaries."  Id.

### 1.  Contract Requirements

Pursuant to the solicitation, patient data would be provided by 4:30 p.m. for next-day transportation; in addition, the awardee would be responsible for managing unscheduled transportation requests.  Id. at 111.  The awardee would be "responsible for all supplies, equipment, facilities, personnel, supervision, and service required to perform work" under the contract, including vehicles meeting certain operating and safety standards.  Id. at 112.  Section V.1.c of the PWS, Response Times, provided as follows:

- pickups must be completed (i.e., "on the road") within 30 minutes of the scheduled pickup time for noncritical, scheduled patients;

- pickups must be completed within 20 minutes of the scheduled pickup time for dialysis, hematology/oncology, radiation, and oxygen patients;

- if the contractor is unable to complete a pickup within 60 minutes of the scheduled time, it must furnish "alternate transportation to meet the 60 minute timeframe"; and

- if the contractor is unable to find alternate transportation, the VA could obtain transportation from another source and charge any excess cost beyond the contract price to the awardee.

Id. at 113-14.  Untimely pickups would result in reductions in the trip price paid by the VA.  Id. at 117.  To receive favorable performance evaluations, the awardee would be required to meet the following standards, among others:

- 95% of pickups completed timely;

- 100% of vehicles properly maintained and certified annually by Arizona Weights and Means; and

- 100% of drivers and attendants "properly licensed, trained[,] and competent to provide the services in the contract."

Id. at 117-18.

## 2. Proposal Submission Requirements

Offerors were instructed to submit their proposals in three files, one for each volume: (1) General Information and Price/Cost Schedule, (2) Technical Capability, and (3) Past Performance. Id. at 124-25. Offerors were further instructed that "[a]ll information . . . shall be confined to the appropriate proposal volume in order to facilitate independent evaluation." Id. at 123.

For the Price volume, offerors were required to complete a Price/Cost Schedule. Id. at 124. A list of DOL-determined SCA wages for Pima County, Arizona and related information was contained within the solicitation to assist offerors in completing the Price/Cost Schedule. See generally id. at 149-59.

With respect to the Technical Capability volume, offerors were instructed to

provide a narrative addressing [the offeror's] relevant technical capabilities and methodology for completing the requirements of this procurement in accordance with the [PWS] and as described in the Evaluation Criteria. Review and rating of the Technical Capability Package will focus on how the contractor addresses items such as the following:

**Technical Solution—The offeror[']s technical solution is described in sufficient detail to evaluate compliance with the requirements in the solicitation and should address, at a minimum, the following:**

- Description (detailed work plan) of the offeror's technical solution as it relates to addressing all activities, personnel resources, equipment to accomplish contract requirements, and a proposed schedule for beginning performance upon contract award. . . . The work plan should illustrate how the offeror will conform to these requirements.

. . . .

- Description of the type(s) of equipment to be employed, number to be used, how to be utilized, owned or leased, serviceability (condition), Americans With Disabilities Act (ADA) compliance, etc.

**Supporting Documentation—The offerors are to provide documentation in support of the following:**

. . . .

- Copy of insurance certificates and permits as required by state law to operate and own a non-emergency medical transportation service.

. . . .

- Detailed quality control plan . . . .

- Identification of any inspections performed on transport vehicles to . . . verify the reliability and safety of vehicles used to transport patients.  Additionally, all vehicles must have functional Heating, Ventilation, and Air Conditioning (HVAC).

Id. at 124-25.

With respect to the Past Performance volume, offerors were instructed to

provide evidence of satisfactory past performance within the last five (5) years . . . for a minimum of three (3) but no more than six (6) Government and/or Commercial contracts (prime or major subcontractor) of a similar scope to that described by the PWS associated with this solicitation.  This information will be evaluated for relevance to this procurement in relation to the offeror[']s technical capability.

Id. at 125.  Further, offerors were advised that that review and rating of past performance could include other considerations:

The [VA] may also consider other relevant information when evaluating an offeror's past/present performance.  . . .  The [VA] may also review past performance history obtained from other

-11-

> federal agency web sites, i.e., [CPARS], Past Performance
> Information Retrieval System (PPIRS), etc.

Id.

Finally, offerors were advised that the VA "intend[ed] to award a contract based on the initial offers, without discussions," pursuant to FAR 52.215-1.  Id. at 130; accord id. at 33.

### 3.  Evaluation Criteria

Pursuant to FAR 52.212-2, the contract would be awarded using a best-value trade-off approach

> to the responsible offeror whose offer conforms to the solicitation
> by evaluating the following factors:
>
> - Technical Capability
>
> - Past Performance
>
> - Price
>
> Technical Capability is more important than Past
> Performance and Price.  Past Performance is more important than
> Price.  Technical and Past Performance, when combined, are
> significantly more important than Price, however Price is still an
> important factor and can be the determining factor in making the
> award.

Id. at 126.

The evaluation criteria for the Technical Capability factor mirrored the requirements for the Technical Capability volume of the proposals.  Compare id. at 127-28 (evaluation criteria), with id. at 124-25 (proposal requirements).  The evaluation criteria for the Past Performance factor similarly mirrored the requirements for the Past Performance volume of the proposals, compare id. at 128 (evaluation criteria), with id. at 125 (proposal requirements), and also contained additional information:

> Offerors are cautioned to submit sufficient information and
> in the format specified in the proposal preparation instructions. . . .
> When [a] relevant performance record indicates performance
> problems, the [VA] will consider the number and severity of the
> problems and the appropriateness and effectiveness of any
> corrective actions taken (not just planned or promised).  The [VA]

-12-

may review more recent contracts or performance evaluations to ensure corrective actions have been implemented and to evaluate their effectiveness.  Communication conducted to resolve minor or clerical errors will not constitute discussions and the contracting officer reserves the right to award a contract without the opportunity for proposal revision.

Offerors are authorized to <u>provide information on problems encountered</u> on the identified contracts and the offeror's corrective actions [in accordance with] FAR 15.305(a)(2)(ii).

Past performance regarding predecessor companies . . . or sub-contractors <u>that will perform major or critical aspects</u> of the requirement will be considered as highly as past performance information for the principal offeror.  . . .

. . . .

The [VA] reserves the right to consider past performance information regarding predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspect of the requirement provided by the offeror, <u>as well as information obtained from any other sources</u>, to establish a past performance rating.

<u>Id.</u> at 128-29 (emphases added).

According to the Source Selection Plan, proposals would be initially screened by the contracting officer "to determine if they [met] the basic intent" of the solicitation—in other words, the initial screening was "not an evaluation of the technical or other specific requirements that will be evaluated"—and then forwarded to the evaluation panel.  <u>Id.</u> at 29.  For the Technical Capability factor, the members of the evaluation panel would evaluate each proposal individually "on its own merit"—i.e., not in comparison to the other proposals—and then the team would reach a consensus evaluation.  <u>Id.</u> at 34.  Past performance and price would be evaluated by the contracting officer.  <u>Id.</u> at 28-29.  After each factor was evaluated, the evaluations would then be forwarded to the Source Selection Authority for a final decision.  <u>Id.</u> at 29.

The Technical Capability factor was to be evaluated using the following ratings and definitions:

| Rating | Definition |
| --- | --- |
| Excellent | Proposal has exceptional strengths that will significantly benefit the [VA] and offers an[] excellent chance of success with highly experienced staff. |
| Very Good | Proposal demonstrates good understanding of the requirement and approach that exceeds performance or capability standards. |
| Average | Proposal demonstrates acceptable understanding of requirements and approach that meets performance or capability standards. |
| Marginal | Proposal demonstrates a shallow understanding of requirements and approach that only marginally meets performance or capability standards necessary for minimal but acceptable performance. |
| Unsatisfactory | Proposal shows lack of understanding of the requirement, or omission in major areas. Deficiencies have no chance to be corrected. |

Id. at 30.  Similarly, the Past Performance factor was to be evaluated using the following ratings and definitions:

| Rating | Definition |
| --- | --- |
| Substantial Confidence | Based on the offeror's Past Performance history, the [VA] has a high expectation that the offeror will successfully perform the required effort. |
| Satisfactory Confidence | Based on the offeror's Past Performance history, the [VA] has an expectation that the offeror will successfully perform the required effort. |
| Limited Confidence | Based on the offeror's Past Performance history, the [VA] has a low expectation that the offeror will successfully perform the required effort. |
| No Confidence | Based on the offeror's Past Performance history, the [VA] has no expectation that the offeror will be able to successfully perform the required effort. |
| Neutral | No Past Performance information provided relative to this acquisition.  The Contracting Officer reserves the right to consider all other evaluation aspects to justify award. |

Id. at 31.  Similarly, under the Price factor, the contracting officer would "determine whether an offeror[']s proposed prices for the project [were] realistic, complete, and reflect[ed] an understanding of the solicitation requirements, and . . . provide an assessment of the reasonableness of the proposed price."  Id. at 33.  The VA estimated that the total estimated value of the contract award for the base year and four option years would be approximately $14 million.  Id. at 59.

Ultimately, the VA planned to award the contract to the offeror "whose proposal [was] determined to represent the best overall value" to the VA.  Id. at 33.

### C.  Plaintiff's Proposal

Seven offerors, including plaintiff, submitted proposals in response to the solicitation by the August 30, 2017 deadline.  Id. at 866.  Mr. Price submitted plaintiff's proposal on the morning of the due date, and Mr. Lebano confirmed its receipt within minutes.  Id. at 660.  In signing each volume of the proposal on behalf of plaintiff, Mr. Price certified that plaintiff "fully agree[d] with all terms, conditions, and provisions included in the solicitation documents," took "no exceptions to the contractual and/or technical terms and conditions of the solicitation," and had not "modified any contractual or technical terms."  Id. at 580, 594, 620.

In the general information portion of its proposal, plaintiff avowed:

> We have teamed with National Mobility (dba Envoy America)[] in a prime-subcontractor relationship to support ambulatory transportation services.  National Mobility is a current incumbent subcontractor for [the VA on one of the bridge contracts].
>
> . . . Our pricing includes all labor, tools, equipment, vehicles, facilities, training, and supplies in accordance with the requirements of the solicitation for ambulette transportation services.  The pricing being presented is in accordance with our technical approach.
>
> [Plaintiff's] pricing is complete and considers all equipment, technologies, and other resources to provide timely and quality services.  Our price and technical solutions comply with [DOL] interpretations for SCA compliance.  [Plaintiff] is fully knowledgeable in SCA compliance and [plaintiff] presented a price solution that demonstrates [its] full understanding of the [DOL's] requirements of SCA wages for Shuttle Bus Drivers and other labor classifications.  We have properly mapped the job duties of our personnel to the SCA wage determinations for performance on this contract.

> . . . [Plaintiff's team] provides the [VA] with the following betterments and value-added services:
>
> . . . .
>
> - Van replacement, with 4 newer wheelchair/stretcher vans <u>each</u> year throughout the period of performance.
>
> . . . .
>
> - Ambulatory fleet that is 2005 or newer and large roomy cars with 4 doors.

<u>Id.</u> at 586.

Plaintiff's total proposed price for all five years of contract was $21,957,292.40.  <u>Id.</u> at 593.  Plaintiff also represented that it was not then "presently debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by any Federal agency" and that it had not "within a 3-year period preceding this offer, had one or more contracts terminated by default by any Federal agency."  <u>Id.</u>

In the Technical Capability volume of its proposal, plaintiff represented that its past performance reflected "100% performance objectives met on all Federal contracts"; touted its relationship with National Mobility, to whom it was "subcontracting ambulatory services"; and emphasized that it was "mission-ready" and prepared to execute "a seamless transition" upon contract award.  <u>Id.</u> at 597; <u>see also id.</u> at 607 (highlighting National Mobility's record of having "exceeded 100% of the established performance objectives on the current contract"), 613 (noting that its team had "consistently met 100% on-time performance metrics for scheduled and nonscheduled patient transports [and] 100% of all dispatched calls").  Plaintiff stated that its team—i.e., plaintiff and National Mobility—planned to employ twenty nonambulatory drivers and ninety ambulatory drivers to support the contract, including thirty-seven "mission-ready drivers" then employed by National Mobility.  <u>Id.</u> at 601-03.  Plaintiff did not specify whether the drivers then employed by National Mobility would be directly hired or remain subcontracted, and did not otherwise identify the extent to which National Mobility would be providing services.  Plaintiff emphasized that "over 30% of Team VNT's workforce are Veterans," remarked it "endeavor[ed] to achieve a goal of 70% Veteran employees" on the contract, and championed the benefits of having "over 90% of [its] work force and 100% of [its] drivers [being] aged 50 or over."  <u>Id.</u> at 603.

With respect to vehicles, plaintiff stated that "Team VNT's in-place assets . . . include 15 mission-ready non-ambulatory vans and 53 additional ambulatory vehicles [ready] to assume full operational performance on day one of the contract."  <u>Id.</u> at 601.  Later in its proposal, plaintiff identified a lesser number of vehicles, declaring:

> Team VNT has a fleet of 15 vans configured to support
> wheelchair and stretcher transports . . . and 37 sedans and vans to
> support ambulatory services. . . .  Our fleet of 15 non-ambulatory
> vehicles includes 11 in-service for daily transports, and four
> stand-by vehicles. . . .  For ambulatory services, we are doubling
> our fleet by October 1[, 2017, the projected contract start date,]
> enabling us to operate at full capacity.
>
> . . . .
>
> Our ambulatory service vehicles are spacious and
> comfortable and our non-ambulatory service vehicles are ADA
> compliant in accordance with state of Arizona regulations.
> Non-Ambulatory vehicles . . . meet all required Federal
> [Department of Transportation] and Arizona State safety
> standards for non-emergency transport vehicles . . . .  Most of the
> vehicles that Team VNT is providing in support of this contract
> are 2005 or newer.  All vehicles are well-maintained, clean, and
> mission ready.  . . .

Id. at 604.  Plaintiff then provided a table listing a total of fifty-two vehicles, thirty-seven of
which were identified as a "Passenger Vehicle" and fifteen of which were listed as various other
types, i.e., for nonambulatory service.  Id. at 604-05.  Half of the vehicles were 2012 or newer
models, and all but three (all of which were designated as nonambulatory) were 2005 or newer.
Id. at 604-05.

In the "Insurance Certifications" portion of its Technical Capability volume, plaintiff
indicated that it was

> in the process of renewing [its] insurance, and at the time of this
> submission [its] broker was processing [plaintiff's] ACORD
> certificate.  [Plaintiff] will forward [its] certificate to the
> Contracting Office upon receipt . . . .

Id. at 615.  Accordingly, plaintiff included in its proposal a general liability insurance quotation
dated August 22, 2017, that purported to be valid for sixty days, named plaintiff as the applicant,
and listed thirty-five specific drivers.  Id. at 615-17; see also id. at 617 (indicating that seventeen
of the thirty-five identified drivers were born after August 1967, i.e., were younger than fifty
years old when plaintiff submitted its proposal).  Plaintiff also submitted, as a separate
attachment alongside its proposal, a Certificate of Liability Insurance reflecting that it held a
commercial general liability insurance policy valid from August 30, 2017, to August 30, 2018.
Id. at 579, 643, 2838.  In addition, plaintiff included in its proposal Certificates of Liaiblity
Insurance reflecting that National Mobility carried commercial general liability and automobile
insurance policies valid from March 8, 2017, to March 8, 2018.  Id. at 618.  Further, plaintiff
provided a Vehicle for Hire permit for fifteen livery vehicles issued by the Arizona Department

-17-

of Transportation Vehicles that was valid from August 27, 2017, through August 27, 2020, and named plaintiff as the licensee.  Id. at 619.

In the Past Performance volume of its proposal, plaintiff proclaimed that it had "proven its ability to adapt, improve, and succeed in safely transporting both ambulatory and non-ambulatory patients/beneficiaries" and that its subcontractor, National Mobility, "currently maintains a 100% customer satisfaction rating as an incumbent [sub]contractor for the [Southern Arizona VA] for the ambulatory transportation services they have provided over the past 90+ days."  Id. at 622.  Plaintiff then listed multiple accolades that National Mobility had received with respect to its incumbent performance.  Id.  Plaintiff provided five project references and reported that it had requested a Past Performance Questionnaire from the point of contact for each of the five identified contracts to be sent directly to the contracting officer responsible for the solicitation.  See generally id. at 623-42.

Plaintiff listed the Southern Arizona VA and the prior contract as its first past performance reference, and identified Mr. Thiel as the contracting officer and point of contact. Id. at 624.  Plaintiff reported that the period of performance was May 2015 through May 2017, and stated that it performed the following number of transports each week:  200-300 wheelchair, 10-20 stretcher, 500-700 ambulatory, and 1-4 special needs.  Id.  Plaintiff indicated that it received transport orders for the following day in addition to "last-minute unscheduled add-ons via phone that required servicing within 45 minutes," and that it "consistently met or exceeded performance objectives throughout [the] contract, achieving 100% of performance objectives for safe and timely pickups."  Id. (emphasis added).  In conjunction with plaintiff listing the prior contract as a past performance reference, Mr. Price asked Mr. Thiel to complete a Past Performance Questionnaire.  Id. at 634-38.  Specifically, Mr. Price asked Mr. Thiel to provide his "thoughtfulness and any highlights that [Mr. Thiel] deem[ed] beneficial for sharing" with Mr. Lebano, the procuring contracting officer on the new contract, and noted that Mr. Lebano "consider[ed] plaintiff's] historical performance as a very necessary ingredient for demonstrating a level of competency" for the new contract.  Id. at 634.

The remaining past performance references for plaintiff were the San Francisco VA and the United States Department of Defense Education Activity ("DoDEA") in Puerto Rico.  Id. at 625-26.  In addition, plaintiff listed two past performance references for National Mobility: (1) National Mobility's subcontract with Power Arizona LLC on the bridge contract with the VA, for which National Mobility provided approximately 1600 ambulatory transports per week, id. at 627; and (2) National Mobility's contract with the American Cancer Society in the greater Tucson and Phoenix areas to provide approximately 310 ambulatory transports per week, id. at 628.

The VA received three Past Performance Questionnaires for plaintiff:  one for plaintiff's prior contract and one for each of National Mobility's contracts.  Id. at 1847, 1850.  Mr. Thiel completed the reference for the prior contract, noting that the value of the two-year effort from May 2015 through May 2017 was $6.4 million.  See generally id. at 2349-51.  The Past Performance Questionnaire was divided into six categories—management effectiveness, quality of service and workmanship, timeliness/adherence to schedules, quality control, customer

-18-

satisfaction, and compliance.  Id. at 2350-51.  Within each category, Mr. Thiel rated multiple
subcategories; overall, he gave twelve Neutral/Unknown Confidence ratings, ten Marginal/Little
Confidence ratings, three Unsatisfactory/No Confidence ratings, and zero Exceptional/High
Confidence, Very Good/Significant Confidence, or Satisfactory/Confidence ratings.  Id. at
2349-51.  His narrative comments were as follows:

- "During the term of our contract the contractor experienced
  several turnovers at the manager position.  There was also an
  internal struggle within the company that affected the
  performance as the manager threatened to fire employees who
  attended weekly progress meetings.  Contractor did not pay
  subcontractors on time."  Id. at 2350.

- "Contractor's overall quality was satisfactory.  There were
  times they did not follow contract procedures or their own
  internal procedures.  One of these incidents occurred while
  trying to transport an 80 year old patient who was injured due
  to not following procedures."  Id.

- "Timeliness was an issue at first.  The contractor got better at
  this as the VA actively engaged the contractor on their
  performance."  Id.

- "Quality control plan and proposal approach completely
  ignored during contract performance."  Id. at 2351.

- "Customer satisfaction overall was satisfactory.  The VA had
  to go to great lengths to work with the contractor to help them
  perform at a satisfactory level."  Id.

- "Contractor was fined by DOL for approximately $480K in
  unpaid wages to employees under SCA."  Id.

- "Contractor was given multiple letters of concern, a cure
  notice, a show cause notice[,] and eventually a termination for
  cause."  Id.

- "Contractor does not understand working with the federal
  government and the laws and regulations that go along with
  that as evidenced by the DOL investigation.  Contractor did not
  pay [its] sub-contractors timely, and even did not pay [its] own
  employees.  I believe that they want to do a good job, but have

> no concept of how to conform to a contract's terms and
> conditions, and continue wanting to do things their own way
> regardless of what the contract, or law[,] state[s]." Id.

National Mobility's reference for its American Cancer Society contract noted that the value of the contract, which began in February 2016 and was ongoing, was $100,000 per year; provided twenty-five Exceptional/High Confidence ratings across all subcategories; and stated that it was "currently expanding [its] contracts with [National Mobility] to several additional territories based on the superior service that [it] provide[s] to our patients." Id. at 2352-55. National Mobility's reference for its subcontract on the bridge contract with the VA noted that the value of the subcontract, which began on June 5, 2017, and was ongoing as of August 30, 2017, was $290,000; provided one Very Good/Significant Confidence, eighteen Satisfactory/Confidence, five Neutral/Unknown Confidence, and one Marginal/Little Confidence ratings across all subcategories; indicated that National Mobility was "not doing any consecutive out of town trips [or] any special mode transports"; and stated that it would award another contract to National Mobility. Id. at 2345-48.

### D.  Evaluation of Proposals and Contract Award

Once the offerors submitted proposals, the evaluation panel—comprised of Kyle Cipra (Supervisor, Patient Transportation) and Sherrie Miller (Business Operation Service Line Administrative Officer)—evaluated the Technical Capability volumes, and the contracting officer—Mr. Lebano—evaluated the Past Performance and Price volumes.[9] Id. at 866-67. These evaluations were then forwarded to the Source Selection Authority, Mr. Thiel. Id. at 867.

As reflected in the initial evaluations, Owl's technical proposal received "Very Good" ratings from each individual evaluator and a "Very Good" consensus rating. Id. at 710-11, 724-25. Owl's past performance rating was "Substantial Confidence," id. at 697, and Owl's total proposed price was $20,654,918.00, id. at 471. Plaintiff's technical proposal received "Marginal" ratings from each individual evaluator and a "Marginal" consensus rating. Id. at 718-19, 732-33. Plaintiff's past performance rating was "No Confidence," id. at 705, and its total proposed price was $21,957,292.40, id. at 593. As reflected in the Source Selection Decision, Mr. Thiel agreed with the ratings issued by the evaluators for six of the seven offerors. Id. at 887. He did not evaluate the seventh offeror because it was not a verified service-disabled, veteran-owned small business at the time of its proposal submission. Id. at 885; see also id. at 662 (reflecting Mr. Lebano's status verification efforts). He also observed that the Independent Government Estimate ("IGE") of the price for the new contract was "significantly undervalued" because five of the evaluated prices (including Owl's and plaintiff's) were 40-48% higher than the IGE, and the sixth evaluated price was nearly 70% higher than the IGE and twice as high as the lowest offered price. Id. at 886. Mr. Thiel noted that the IGE's undervaluation was "most

---

[9]  Mr. Cipra was also involved in resolving plaintiff's late pickup issues in April, May, and June 2016. See generally AR 2929-39.

likely a result of the estimate being based upon rates paid to the previous contractor [who was] terminated due to issues with underpaying their employees not in accordance with [SCA] rates." Id.

Mr. Thiel concluded that Owl and one other offeror tied for the highest technical rating (which was the second-highest rating available), Owl and a third offeror tied for the highest past performance rating (which was the highest rating available), and therefore Owl was the highest rated when the technical and past performance ratings were combined. Id. at 887-88. Mr. Thiel further concluded that Owl offered the lowest price. Id. Because Owl was the highest rated and proposed the lowest price, Mr. Thiel determined that Owl offered the best value to the VA. Id. at 888. Accordingly, on October 26, 2017, after finding that Owl was a responsible offeror, id. at 790-92, the VA notified the unsuccessful offerors, id. at 897-908, and awarded Owl the contract, id. at 909. Plaintiff received a debriefing on November 3, 2017. Id. at 1439, 1457.

### E. Initial Protests and Corrective Action

In the meantime, on October 30, 2017, plaintiff filed a size and status protest regarding Owl. See generally id. at 969-72. Specifically, plaintiff alleged that Owl had revenues in excess of the allowable amount for small business concerns and accordingly was ineligible to compete for the new contract since the new contract was designated as a 100% set-aside for service-disabled, veteran-owned small business concerns. Id. at 970. The protest triggered a stay of performance of the awarded contract. Id. at 1112. On December 4, 2017, the United States Small Business Administration confirmed Owl's status as a small business concern. Id. at 1614-20.

While awaiting the outcome of its size and status protest, plaintiff filed a bid protest at the GAO on November 13, 2017. Id. at 1456. Plaintiff alleged generally that the VA's evaluation was flawed. See id. at 1458-59. Plaintiff averred that, but for the VA's errors, it would have been the awardee. Id. at 1464.

In response to the protest, on November 27, 2017, the VA issued a Notice of Corrective Action and Request for Dismissal. Id. at 1604-06. Specifically, the VA stated that it would "cancel the award of the contract to [Owl], . . . re-evaluate proposals in the manner set forth in the solicitation, and . . . proceed to make contract award in accordance with the criteria published in the solicitation." Id. at 1604. On December 4, 2017, the GAO dismissed plaintiff's protest as academic based on the VA's proposed corrective action. Id. at 1612.

**F. Reevaluation**

Pursuant to the amended Source Selection Plan, Mr. Cipra and Ms. Miller again served as the technical evaluators.  Id. at 1625.[10]  Mr. Lebano, as the contracting officer, served as the past performance and price evaluator.[11]  Id. at 1825.  In addition, Mr. Thiel, as the division chief, served as the Source Selection Authority.  Id. at 1625.  The same ratings and substantive definitions were used to evaluate both the Technical Capability and Past Performance factors as were used in the previous evaluations.  Compare id. at 1630-31 (ratings and definitions for the reevaluations per the amended Source Selection Plan), with id. at 30-31 (ratings and definitions for the previous evaluations per the original Source Selection Plan).  Mr. Cipra and Ms. Miller provided consensus evaluations for the six responsive offerors that "supersede[d] all previously submitted technical evaluations."  Id. at 1637.  The VA also queried CPARS records as part of its past performance evaluation.  See generally id. at 1644-1821.

In the new Source Selection Decision, Mr. Thiel rated plaintiff's technical proposal as Average, stating that plaintiff had "demonstrated [its] ability to accomplish the solicitation requirements as described in the PWS."  Id. at 1845.  Mr. Thiel then identified five strengths and seven weaknesses in plaintiff's technical proposal:

**Strengths:**

- [Quality control] table provided, page 12 and page 14-17.  Monitor performance measures through patient surveys (this may or may not be allowable as a result of patient privacy—HIPAA).  [Program manager] monitors compliance and performance.

- Contract transition mentioned in the documents, page 3 planning session layout.

- They will have 10 cross-trained on call drivers between 5pm and 7am with one week on and four weeks off (on call).

---

[10]  The amended Source Selection Plan was organized in the same format as the original Source Selection Plan; the amendment contained updated descriptions for the adjectival ratings, but no substantive changes.  Compare AR 1623-36 (amended Source Selection Plan), with id. at 26-40 (original Source Selection Plan).

[11]  Mr. Thiel was designated as the contracting officer in the amended Source Selection Plan, but was replaced in that role by Mr. Lebano, as reflected in the new Source Selection Decision.  Compare AR 1825 (Source Selection Decision), with id. at 1625 (amended Source Selection Plan).

- Page 1 states they have 52 well-maintained vehicles with safety equipment and tracking software.

- ADA compliance on page 15.

**Weaknesses:**

- [Plaintiff's] work plan discussed their management approach (industry best practices), tools and technologies, and communication mechanisms.  However, it lacked some detail in regards to how [plaintiff] will establish operations and implement work.

- Page 1 states that 52 well maintained vehicles (no type identified).  Page 5 states 15 non-ambulatory vans, 53 ambulatory vans.  Page 8 states 15 vans to support with wheelchair and stretcher and 37 sedans.  Fleet of 15 non-ambulatory vehicles includes 11 for daily transportation.  Very confusing on total number of vehicles, type[,] and availability.

- The use of sedans for transportation is not optimal for elderly patients with limited mobility.

- On page 9, vehicle list shows some vehicles as old as 19 years (3), two stretchers and one ambulatory.  Age of vehicles is concerning in the desert heat.  This also raises a concern about the serviceability and condition of these vehicles.  Newer vehicles are generally more reliable, comfortable, efficient, and safer than older vehicles.

- Quote for insurance on renewal process, no proof of current insurance.  Accord expire[d] 9/16/2017.

- Document states on page 1 the company will be subcontracting services with another company.  Although subcontracting is permitted, it introduces additional risk into the procurement because the offeror must rely on vehicle(s) owned and operated by a third party and personnel who do not work for the offeror to provide services.

- The offeror appears to want 1-2-3 week schedule ahead from Patient Travel.  This will not work.  Schedules change daily.  This creates a risk if the offeror needs this much advance notice to perform.

Id. at 1845-46.  Mr. Thiel summarized his technical rating of plaintiff as follows:

> [Plaintiff] responded to most technical evaluation criteria and [its] proposal demonstrates an Average understanding of the requirement.  [Plaintiff's] approach meets performance or capability standards and represents a solution expected to ensure that necessary services are rendered . . . .  [Plaintiff's] submission did include some weaknesses that were generally offset by the noted strengths.  Overall, the benefits outlined in their technical proposal merit a rating of Average.

Id. at 1846.  Mr. Thiel later acknowledged (during plaintiff's second GAO protest) that plaintiff provided an actual certificate of insurance concurrent with its proposal, and explained:

> The insurance was overlooked as it was provided as an attachment to an email, and not in accordance with the directions outlined in the solicitation.  . . .  Because [plaintiff] did not include proof of current insurance in the correct volume of the proposal, and [its] proposal stated that it was only providing a quote, I agreed with the Technical Evaluation Board findings that lack of proof of current insurance was a weakness . . . .  Had I known that [plaintiff] submitted the proof of current insurance I would not have found this to be a weakness under Technical Capability.
>
> While this was considered a weakness, it was not something considered as a significant weakness.  Removing this weakness [would not have changed plaintiff's] overall Technical Capability as Average, nor [would it have changed] the decision that award of the contract to [Owl] represents the best value to the [VA].

Id. at 2838.

Mr. Thiel also analyzed plaintiff's past performance as part of his Source Selection Decision.  See generally id. at 1846-52.  He determined that plaintiff's prior contract and the San Francisco VA contract were relevant, but that its DoDEA contract was not relevant.  Id. at 1846-47.  Mr. Thiel then summarized the Past Performance Questionnaire he had submitted regarding the prior contract—no Past Performance Questionnaire regarding plaintiff's San Francisco VA contract was returned—and noted that he had left both "[p]ositive and negative

-24-

comments" for plaintiff but had also "indicated that he would not recommend [plaintiff] for similar requirements in the future." Id. at 1847-48.  In addition to reviewing the Past Performance Questionnaire, Mr. Thiel provided a summary of CPARS records for the contracts identified by plaintiff, i.e., the prior contract and the San Francisco VA contract. Id. at 1848-49.  He noted that "[a]ll comments left for [plaintiff] are positive and both raters indicated that they would recommend [plaintiff] for similar requirements in the future." Id. at 1849.  In addition to the Past Performance Questionnaire and CPARS records, Mr. Thiel reported that

> past performance information for [plaintiff] was obtained from the procurement files and personal knowledge of the [Southern Arizona VA contracting office] staff regarding [plaintiff's] performance, and termination for default in June 2017 for refusing to perform, under [the prior contract].  This part performance information is for a contract that is the same scope as the current procurement, and is therefore relevant to the current procurement, because the current procurement is for the re-procurement of the contract for which [plaintiff] defaulted.  The following items were identified in reviewing [plaintiff's] past performance on [the prior contract] and are considered to be negative past performance information:
>
> - [Plaintiff] received a Cure Notice on May 19, 2017 and Show Cause Notice on June 1, 2017 . . . .  [Plaintiff] abruptly ceased performance of the contract and in the process numerous patients were stranded at the hospital and up to 100 patients per day thereafter were in jeopardy of missing their scheduled appointments.  Ultimately, the contract was terminated for cause on June 15, 2017 . . . .
>
> - Examples of problems experienced on [the prior contract] prior to [plaintiff's] termination are as follows:
>
>   a) November 16, 2016—Letter of Concern, Injured patient, required corrective action
>
>   b) September 13, 2016—Injured patient, failure to report accident on time, required corrective action
>
>   c) May 27, 2016—Letter of Concern, failure to meet transportation timelines, required corrective action
>
>   d) April 28, 2016—Letter of Concern, failure to meet transportation timelines, required corrective action

- The [DOL] implemented a mandatory withholding of
contract payments to [plaintiff] for [the prior contract] for
failing to pay [its] employees [SCA] wages.  To the
contracting office's knowledge, [plaintiff] has not
completely resolved the DOL imposed withholding.

Id. at 1849-50.

Mr. Thiel also recognized that both of plaintiff's past performance references for
National Mobility, its proposed subcontractor, were relevant.  Id. at 1850.  He indicated that both
references returned Past Performance Questionnaires, and that "[a]ll positive comments were left
and the raters indicated that they would recommend [National Mobility] for similar requirements
in the future."  Id.  He then listed several positive comments provided for National Mobility on
the Past Performance Questionnaires and noted that there were no CPARS records available for
National Mobility.  Id. at 1851.  Finally, he summarized the past performance evaluation for
plaintiff as follows:

The contracting officer has considered the past
performance information described above for both [plaintiff] and
[National Mobility].  Because [plaintiff] previously defaulted and
refused to perform on a contract for the same services for the same
geographic location as the current procurement, the contracting
officer has no expectation that [plaintiff] will successfully perform
the current procurement on its own.  Although [plaintiff] has
proposed to use the services of a subcontractor with a recent
history of successful past performance providing [the VA] some of
the services required by the current procurement, the proposal does
not describe the percentage of services that will be provided by
[National Mobility].  Additionally, [plaintiff's] CPARS comments
note that [plaintiff], in the past, did not timely pay its
subcontractors, raising a question of how long [National Mobility]
might actually perform work on this contract.  For these reasons,
and because [plaintiff] would ultimately be in control of the
contract, the contracting officer has assigned little weight to
[National Mobility's] past performance record when evaluating the
Past Performance factor for [plaintiff].  As a result, the contracting
officer has determined that [plaintiff] has earned a Limited
Confidence rating for the Past Performance factor.  Based on the
offeror's Past Performance history, the [VA] has a low expectation
that the offeror will successfully perform the required effort.

Id. at 1852.

-26-

Next, in evaluating price reasonableness, Mr. Thiel acknowledged that "it is readily apparent that the IGE submitted for this procurement was significantly undervalued" and therefore "the analysis of prices to determine price reasonablesness did not use the IGE, but rather relied upon a comparison of the prices offered for this procurement on the basis of adequate price competition [in accordance with] FAR 15.404-1(b)(2)(i)." Id. at 1857.

After discussing the technical rating, past performance rating, and pricing for each of the six responsive offerors, Mr. Thiel summarized the evaluations in a chart as follows:

| Offeror[12] | Technical Rating | Past Performance Rating (Confidence) | Total Proposed Contract Price |
|---|---|---|---|
| Owl | Very Good | Substantial | $20,654,918.00 |
| B | Average | Substantial | [. . .] |
| C | Very Good | Satisfactory | [. . .] |
| D | Average | Satisfactory | [. . .] |
| Plaintiff | Average | Limited | $21,957,292.40 |
| F | Marginal | Satisfactory | [. . .] |

Id. at 1858.  Mr. Thiel determined that all of the proposed prices were reasonable except the one submitted by Offeror D.  Id. at 1847.  He concluded that Owl "earned the highest combined rating for the Technical and Past Performance factors out of all offerors eligible for contract award [and] also proposed a price which is lower than that of any other submitted proposals." Id. at 1859.  In other words, Owl "submitted the highest-rated, lowest-priced proposal" and thus represented "the best value offer" to the VA.  Id.  Mr. Thiel signed the Source Selection Decision on Friday, January 5, 2018.  Id.

That same day, Mr. Lebano notified Owl of the award and sent Owl the new contract to be signed.  Id. at 1913-14.  The new contract was signed by Owl's president on January 5, 2018. Id. at 1860.  The next day—Saturday, January 6, 2018—Mr. Thiel signed the new contract on behalf of the VA, and a contract award notice was posted on FedBizOpps.gov.  Id. at 1860, 2110. As Mr. Thiel explained during plaintiff's second GAO protest, he posted the award notice on a Saturday because he had been ordered to report to a temporary duty assignment at another location out of state beginning the following Monday, January 8, 2018.  Id. at 2513.  Plaintiff did not request a debriefing following the award notice.  Id.

---

[12]  Mr. Thiel referred to each offeror by a specific letter, rather than by name, throughout the Source Selection Decision document.  AR 1829.

### G. Plaintiff's Second GAO Protest

Plaintiff protested the award of the new contract to Owl at the GAO on January 12, 2018, and attached copies of the original solicitation, slides used as part of its VA debriefing, its proposal, a blank past performance questionnaire, the VA's November 27, 2017 Notice of Corrective Action, and the January 6, 2018 Award Notice.[13]  Id. at 1958.  Plaintiff alleged generally that the VA acted in bad faith in taking corrective action and in evaluating its proposal, and that the VA's technical and past performance evaluations were flawed.  Id. at 1959-60.  Mr. Lebano stayed performance of the new contract on January 16, 2018, the next business day.  Id. at 2111.  After multiple rounds of briefing, the GAO denied the protest on April 16, 2018.  Id. at 2863.

### H. Procedural History

Plaintiff filed suit in this court on May 16, 2018, seeking to overturn the VA's award of the new contract to Owl on generally the same grounds as argued before the GAO.[14]  Plaintiff also moved for a temporary restraining order and a preliminary injunction.  After defendant filed a notice that the VA was willing to suspend performance of the new contract until July 19, 2018, to allow for resolution of the instant protest, the court denied plaintiff's motions for a temporary restraining order and a preliminary injunction as moot.

Plaintiff then filed a motion for discovery and a motion for judgment on the administrative record.  Defendant responded to each motion, and cross-moved for judgment on the administrative record.  After briefing, the court heard oral argument on July 17, 2018.  The motions are now ripe for adjudication.

---

[13]  Plaintiff indicated that a "Notice of Award November 21, 2017" document was attached as an exhibit to its January 12, 2018 GAO protest, AR 1958, but there was no such attachment.

[14]  As a threshold matter, the jurisdiction of the United States Court of Federal Claims to entertain bid protests against the federal government by interested parties is unquestioned.  28 U.S.C. § 1491(b)(1); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1329 (Fed. Cir. 2001).  In the instant protest, plaintiff has made nonfrivolous allegations that the VA improperly evaluated its proposal.  See Distributed Sols., Inc. v. United States, 539 F.3d 1340, 1345 n.1 (Fed. Cir. 2008) ("A non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement is sufficient to establish jurisdiction.").  Further, the parties do not dispute that plaintiff submitted a proposal that was actively considered along with others that were eligible to be awarded the new contract.  See CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983) (finding that a protestor "within the 'zone of active consideration'" had "standing to challenge the proposed award").  Therefore, plaintiff has standing as an "interested party" to bring the instant protest.

## II. PLAINTIFF'S MOTION FOR DISCOVERY

Before addressing the merits of plaintiff's protest, the court must resolve plaintiff's motion for supplementation of the administrative record through discovery.  As set forth in its motion, plaintiff seeks to supplement the administrative record with the following documents: (1) "all non-privileged communications and correspondence . . . between members of the [VA contracting authority] regarding the evaluation of [plaintiff's] offer" for the new contract, (2) "all non-privileged communications and correspondence . . . between members of the [VA contracting authority] and the [DOL] pertaining to the investigation of [plaintiff]" on the prior contract and pertaining to the evaluation of [plaintiff's] bid" for the new contract, and (3) "further documentation regarding pricing."  Mem. Supp. Pl.'s Mot. Disc. & Suppl. Admin. R. ("Pl.'s Mot. Disc.") 2.  Plaintiff also seeks to depose Mr. Thiel, Mr. Auffhammer, Mr. Lebano, and Mr. Cipra.  Id. at 1-2.  Defendant contends that the plaintiff fails to "explain how the current administrative record is insufficient to evaluate the VA's award of the contract," and thus is not entitled to the discovery that it seeks.  Def.'s Resp. Pl.'s Mot. Disc. 10.

### A.  Standard of Review

In bid protests, the proper standard of review to be applied "is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Generally, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  Camp v. Pitts, 411 U.S. 138, 142 (1973); accord Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009).  An administrative record typically contains the materials developed and considered by an agency in making a decision subject to judicial review.  See Camp, 411 U.S. at 142-43 (remarking that an agency's finding must be "sustainable on the administrative record made" by the agency at the time of its decision); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 345, 349-50 (1997) ("[T]he primary focus of the court's review should be the materials that were before the agency when it made its final decision.").

The administrative record "should be supplemented only if the existing record is insufficient to permit meaningful review consistent with [5 U.S.C. § 706(2)(A)]."  Axiom, 564 F.3d at 1381; accord id. at 1380 ("[S]upplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review." (internal quotation marks omitted)).  Supplementation is appropriate when "information upon which the agency relied when it made its decision" is lacking, including "documentation revealing the agency's decision-making process."  Parcel 49C Ltd. P'ship v. United States, 127 Fed. Cl. 570, 573 (2016).  Supplementation might also be necessary "when a subjective value judgment has been made but not explained" or when the administrative record "is missing relevant information that by its very nature would not be found in an agency record—such as evidence of bad faith, . . . or the content of conversations."  Id. (internal quotation marks omitted).  Information that "should have been considered by the agency," but was not, is also appropriate for supplementation.  E.W., Inc. v. United States, 100 Fed. Cl. 53, 75 (2011).  In particular,

depositions may be necessary when the administrative record does not include a basis for the contracting officer's decision.  Impresa, 238 F.3d at 1339.  The party seeking to supplement the administrative record bears the burden of demonstrating why the existing record is insufficient. DataMill, Inc. v. United States, 91 Fed. Cl. 722, 732 (2010).

### B.  Plaintiff Has Failed to Allege Bias or Bad Faith Conduct

Plaintiff's chief argument in support of its motion for discovery is that "bias and bad faith lie at the core of this matter."  Pl.'s Mot. Disc. 5.  It is well settled that government officials enjoy "presumptions of regularity and good faith conduct."  Inforeliance Corp. v. United States, 118 Fed. Cl. 744, 747 (2014).  Accordingly, a party seeking "to put facts relating to bad faith in play" must show "either a motivation for the Government employee in question to have acted in bad faith or conduct that is hard to explain absent bad faith," and then, if successful in doing so, demonstrate that "discovery could lead to evidence would provide the level of proof required to overcome the presumption of regularity and good faith."  Id. at 747-48 (internal quotation marks omitted).  Therefore, a party seeking discovery must set forth "sufficient well-grounded allegations of bias to support supplementation" that "rest on hard facts, not merely suspicion or innuendo."  Id. at 748 (internal quotation marks omitted).  Mere disagreement with evaluation results or identification of agency errors is insufficient to warrant supplementation.  Jacobs Tech. Inc. v. United States, 131 Fed. Cl. 430, 455 (2017).

Plaintiff identifies a handful of "hard facts" in support of its contention that the VA contracting authority exhibited bias or bad faith.  However, plaintiff's charges of bias and bad faith are unavailing.  Because all of the conduct upon which plaintiff relies can be explained absent bias or bad faith, plaintiff fails to make its required threshold showing.

First, plaintiff avows that it was "operating at a 98% on time rate" at the time the VA issued letters of concern regarding plaintiff's failure to achieve 100% on-time performance of the prior contract, whereas the "subject solicitation . . . only required a 95% on time performance," and plaintiff's inability to "meet the impossible 100% standard" was used "negatively against it in evaluating past performance."  Pl.'s Mot. Disc. 6.  In his Source Selection Decision, Mr. Thiel made a passing reference to two letters of concern regarding plaintiff's failure to meet transportation deadlines on the prior contract.  Plaintiff does not dispute that those letters were issued or their accuracy, but instead insists that because its performance on the prior contract would have been sufficient on the new contract, the VA showed bias.  Rather than showing bias, however, Mr. Thiel simply recognized the fact that plaintiff failed to perform according to the standards set forth in the prior contract to which plaintiff agreed.  As defendant emphasizes, "using the prior contract metric to evaluate performance under the prior contract is reasonable on its face, and does not require further explanation."  Def.'s Resp. Pl.'s Mot. Disc. 16-17.  In any event, the solicitation provided that "past performance history" was a major component of the evaluation of each proposal, including "adverse past performance information," which was defined as "past performance information that supports a less than satisfactory rating on any evaluation element or any unfavorable comments received."  AR 128.  Further, plaintiff did not address the letters of concern in its proposal, and merely indicated that it had "consistently met or exceeded performance objectives throughout [the prior] contract, achieving 100% of

-30-

performance objectives for safe and timely pickups." Id. at 624. Indeed, plaintiff's repeated references to itself having "met 100% of all performance metrics" on its prior contracts, see, e.g., id. at 597, undermine plaintiff's contention that the 100% performance standard was unattainable. Therefore, rather than showing bias or bad faith by referencing the letters of concern—of which plaintiff was aware and chose not to address—the VA merely evaluated plaintiff's proposal in line with the criteria outlined in the solicitation.

Second, plaintiff contends that in the Past Performance Questionnaire that Mr. Thiel completed for plaintiff regarding the prior contract, Mr. Thiel "stated that he would never award [plaintiff] another contract." Pl.'s Mot. Disc. 7. Plaintiff avers that this evaluation amounts to a de facto debarment "without any due process" because plaintiff "will likely never again receive a fair and reasonable evaluation of any submitted proposal in" the southwestern United States. Id. Indeed, plaintiff notes that a negative report regarding its DoDEA contract appeared on the CPARS shortly after the VA began the DOL-directed withholding in which the evaluator "needlessly smear[ed plaintiff] without cause." Id. at 8. Plaintiff's allegation is somewhat misleading. Rather than state that he would "never" award plaintiff another contract, Mr. Thiel simply answered "[n]o" to the question, "[i]f given the opportunity, would you award another contract to this contractor?" AR 2351. Regardless, plaintiff's allegation concerning the CPARS report with respect to its DoDEA contract lacks merit. In that report, Noah Mitchell indicated that he would "not recommend [plaintiff] for similar requirements in the future" and listed information specific to that contract. Id. at 1808. In other words, Mr. Mitchell provided a factual history—not a "needless smear"—of plaintiff's performance. Additionally, Mr. Price provided a lengthy rebuttal to Mr. Mitchell's evaluation that is included in the same report. In any event, the DoDEA past performance reference was not considered in the evaluation of plaintiff's proposal because the DoDEA contract was deemed not relevant to the new contract. Further, plaintiff's allegation that Mr. Thiel's evaluation acts as a de facto debarment is merely a conclusory accusation. In the Past Performance Questionnaire, Mr. Thiel noted that plaintiff had been issued "multiple letters of concern, a cure notice, a show cause notice[,] and eventually a termination for cause." Id. at 2351. In other words, rather than exhibiting bias or bad faith, Mr. Thiel supported his evaluation by pointing to specific events involving Mr. Price. As noted above, plaintiff referenced the prior contract in its proposal but failed to address the concerns previously expressed by the VA, concerns of which plaintiff was fully aware. There is no reason to suspect, beyond suspicion and innuendo—neither of which is sufficient to warrant a finding of bias or bad faith—that plaintiff's "side of the story" (including, if applicable, a favorable ruling in the DOL administrative proceedings) will not be given due consideration in future proposals should plaintiff choose to share it.

Third, plaintiff highlights the "satisfactory" rating given by Mr. Auffhammer regarding plaintiff's performance of the prior contract as evidence of Mr. Thiel's bias against plaintiff. Pl.'s Mot. Disc. 9. However, plaintiff fails to consider the ratings provided by Mr. Auffhammer in the CPARS report and by Mr. Thiel in the Past Performance Questionnaire in their proper context. Mr. Auffhammer submitted his CPARS report on May 5, 2016. At that point, the VA had issued only one letter of concern. The withholding of contract funds pursuant to the DOL investigation, which ultimately resulted in the default termination, did not begin until approximately one year later, but before Mr. Price asked Mr. Thiel to complete the Past

Performance Questionnaire.  Therefore, any comparison between the evaluations provided by Mr. Auffhammer and Mr. Thiel is neither relevant nor suggestive of bias or bad faith.

Fourth, plaintiff relies on the VA's failure to ask plaintiff "to clarify certain aspects of [its] proposal or allow[ plaintiff] to respond to adverse past performance ratings," id., as evidence of bias or bad faith.  While the solicitation provided that "[o]fferors may be asked to clarify certain aspects of their proposal or respond to adverse performance information to which the offeror has not previously had an opportunity to respond," AR 128 (emphases added), plaintiff fails to recognize that the VA was not required to do so.  The solicitation provided that each offeror was required to "ensure that [its] proposal establishes [its] qualifications and demonstrates [its] ability to perform all services pertaining to [the] solicitation," id. at 127, and that offerors were "authorized to provide information on problems encountered on the identified contracts," id. at 129.  Further, as discussed above, plaintiff was aware of the adverse past performance information relied upon by the VA in its evaluation.  In short, plaintiff had ample opportunity to provide additional information regarding its past performance in its proposal and simply chose not to do so even though, under FAR 15.305(a)(2)(ii), the VA would have been required to consider plaintiff's "side of the story" regarding adverse past performance information had plaintiff provided it.  In any event, the solicitation explicitly provided that the VA "intend[ed] to award a contract based on the initial offers, without discussions."  Id. at 130.  Therefore, because the VA did not conduct discussions with any of the offerors, its failure to hold discussions with plaintiff does not suggest bias or bad faith.

Fifth, plaintiff asserts that the VA's reliance "on the errant presumption that [plaintiff] violated the DOL's regulations as an unspoken evaluating criterion" demonstrates bad faith because, plaintiff alleges, the VA did not consider plaintiff's "side of the story" despite knowing that plaintiff was contesting the DOL's withholding request.  Pl.'s Mot. Disc. 10.  However, the VA considered plaintiff's adverse past performance on the prior contract—and not plaintiff's compliance with DOL regulations—in evaluating plaintiff's proposal.  Further, offerors were instructed that "[a]ll information pertaining to [each factor] shall be confined to the appropriate proposal volume in order to facilitate independent evaluation."  AR 123.  As noted above, plaintiff's proposal is completely devoid of any reference to the DOL's withholding request and the ensuing Cure Notice, Show Cause Notice, and default termination.  Because plaintiff failed to include its "side of the story" within its proposal, it would have been improper for the VA to consider it.  Therefore, the VA's alleged failure to do so does not suggest bias or bad faith.[15]

Sixth, plaintiff remarks that the VA "rel[ied] on the claim that [plaintiff] failed to pay a subcontractor" as part of its past performance evaluation without providing "any basis for this allegation."  Pl.'s Mot. Disc. 10-11.  Plaintiff avows that "the claim is dubious at best and stems

---

[15]  Plaintiff's appeal rights with respect to the DOL's withholding request are provided in parts six and eight of title 29 of the Code of Federal Regulations.  29 C.F.R. § 4.187(f) (2016).  Plaintiff's appeal rights regarding its termination for cause are outlined in FAR 33.211, as described in the termination notice.  Plaintiff cannot use a bid protest to remedy its failure to pursue the proper avenues for appeal.

from a legal dispute that ultimately sparked the DOL investigation of [plaintiff] in the first place." Id. at 11.  The Source Selection Decision referenced the Past Performance Questionnaire—both of which were authored by Mr. Thiel—regarding the allegation that plaintiff "did not pay subcontractors on time."[16,17]  AR 1847.  The Past Performance Questionnaire itself does not specifically identify the source of Mr. Thiel's averment.  However, the disputes between plaintiff and Arizona Medical Transit and plaintiff and Gentle Care arose during the performance of the prior contract in August 2015 and were the subject of complaints received, meetings attended, and a letter of concern issued by Mr. Thiel.  In other words, Mr. Thiel was well acquainted personally with the subcontractor payment dispute.  Indeed, in the Source Selection Decision, Mr. Thiel referenced the "procurement files and personal knowledge" of his office regarding plaintiff's past performance.  Id. at 1849.  In any event, the dispute giving rise to plaintiff's lawsuit against Arizona Medical Transit was a matter of public record.  Further, the lawsuit was filed after Mr. Price regained control of plaintiff.  Mr. Price was fully informed regarding the dispute, and plaintiff nevertheless chose not to provide its "side of the story" in its proposal.  Therefore, Mr. Thiel's assertions in the Past Performance Questionnaire regarding subcontractor payments fail to demonstrate bias or bad faith despite the lack of citations to specific materials or incidents.

Finally, plaintiff states that the VA failed to give equal weight to National Mobility's past performance evaluation and that such failure "reflects bias and disparate treatment against [plaintiff]."  Pl.'s Mot. Disc. 11-12.  As relevant here, the evaluation criteria contained in the solicitation provided that "[p]ast performance regarding . . . sub-contractors that will perform major or critical aspects of the requirement will be considered as highly as past performance information for the principal offeror."  AR 129 (emphasis added).  The evaluation criteria also provided that past performance information "will be evaluated for relevance to this procurement in relation to the offeror[']s technical capability."  Id. at 128.  In the Source Selection Decision, Mr. Thiel described National Mobility's past performance references and their relevance, but also observed that plaintiff's proposal failed to "describe the percentage of services that will be provided by" National Mobility as one of multiple reasons for National Mobility's past performance being given "little weight."  Id. at 1852.  The VA's failure to give National

---

[16]  Mr. Thiel also indicated, in summarizing plaintiff's past performance evaluation in the Source Selection Decision, that "CPARS comments note that [plaintiff], in the past, did not timely pay its subcontractors."  AR 1852.  However, the only CPARS comment with respect to plaintiff's payment obligations is a comment regarding plaintiff's DoDEA contract that plaintiff had "a lot of problems with employees . . . like paying them late."  Id. at 1808 (emphasis added).  Since this comment concerned employees and not subcontractors, and since the DoDEA contract was deemed irrelevant, the court disregards Mr. Thiel's reference to the CPARS in connection with plaintiff's subcontractor payment issues.

[17]  Defendant correctly observes that plaintiff "fails to identify any regulation or precedent suggesting that a contracting officer involved in a prior termination for default is somehow disqualified from evaluating proposals, including that of a terminated party."  Def.'s Resp. Pl.'s Mot. Disc. 14.

Mobility's past performance more than "little weight" is thus attributable to plaintiff's failure to adequately describe the scope of National Mobility's involvement in its teaming arrangement rather than bias or bad faith.

In sum, the facts on which plaintiff relies to support its allegations of bias and bad faith are attributable to the self-inflicted deficiencies in plaintiff's proposal rather than improper motives on the part of the VA.

## C.  The Administrative Record Is Sufficient for Effective Judicial Review

In addition to alleging bias or bad faith, plaintiff "asserts that the VA relied on unstated evaluation criteria . . . (or no criteria at all)" in appraising plaintiff's proposal, "rendering its award decision arbitrary and capricious and contrary to law."  Pl.'s Mot. Disc. 9.  Plaintiff posits that the VA relied on the "DOL enforcement findings" in evaluating its proposal and that "[d]iscovery will allow Plaintiff to find out how much the [VA contracting authority] relied upon the findings by the DOL in evaluating the subject solicitation."  Id. at 10.

Plaintiff's argument is meritless.  While plaintiff is correct that federal agencies cannot blindly follow other agencies, see Veterans Contracting Grp., Inc. v. United States, 135 Fed. Cl. 610, 618-19 (2017), appeal docketed, No. 18-1409 (Fed. Cir. Jan. 16, 2018), "[i]t is mandatory for a contracting officer to adhere to a request from the [DOL] to withhold funds" and to transfer those withheld funds to the DOL—even "prior to the institution of administrative proceedings," 29 C.F.R. § 4.187(a).  In other words, the VA had no discretion to consider the propriety of the DOL withholding request because it was required to comply.  Further, as explained in the Source Selection Decision, the primary reason that plaintiff received a "Limited Confidence" past performance rating was its prior termination for default.  Therefore, defendant is correct that "[t]he administrative record contains the notice of termination for default as well as the underlying notices from the VA and responses from [plaintiff]," which are "more than sufficient to provide effective judicial review of the contract award decision."  Def.'s Resp. Pl.'s Mot. Disc. 19.

Plaintiff's request for "further documentation regarding pricing," i.e., the process by which the VA determined the IGE, Pl.'s Mot. Disc. 13, is similarly without merit.  In the Source Selection Decision, Mr. Thiel acknowledged that the IGE was undervalued and therefore was not used to evaluate price reasonableness.  Therefore, any documentation regarding the IGE is irrelevant to the propriety of the award decision.

Finally, plaintiff's request for the VA's internal communications regarding the evaluation of plaintiff's proposal must be denied.  The administrative record already contains the individual and consensus evaluations of plaintiff's proposal, the detailed Source Selection Decision, and past performance records relied upon by the VA in evaluating plaintiff's proposal.

### D. Summary

Plaintiff has failed to credibly allege bias or bad faith. Further, plaintiff has failed to show that the administrative record is otherwise insufficient for judicial review. The administrative record as currently constituted will allow the court to conduct a full and fair evaluation of the VA's award of the new contract to Owl. Therefore, plaintiff's motion for discovery must be denied in its entirety.

## III. CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

The court now turns to the parties' cross-motions for judgment on the administrative record. In ruling on such motions, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the record." Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

Plaintiff advances two main arguments in support of its motion for judgment on the administrative record. First, plaintiff contends that the weaknesses assigned to the technical volume of its proposal "are unreasonable and inaccurate" and "inconsistent with the solicitation's evaluation criteria." Pl.'s MJAR 18-19. Second, plaintiff asserts that the VA's past performance evaluation was flawed because the "only way one can reasonably come to a 'Limited Confidence' decision as the VA did . . . is bias." Id. at 30. Plaintiff avers that had the VA "done a meaningful analysis of [plaintiff's] technical capability and accurately evaluated" National Mobility's past performance information, plaintiff "would have been the awardee." Id. at 19. Plaintiff also challenges the VA's price analysis and best-value tradeoff. Defendant argues that "the VA conducted a reasonable evaluation of [plaintiff's] technical approach, and properly evaluated [plaintiff's] past performance." Def.'s Resp. Pl.'s MJAR & Def.'s Cross-Mot. J. Administrative R. ("Def.'s Cross-Mot.") 37.

### A. Legal Standard

As explained above, the proper standard of review in bid protests provides that "an agency's decision is to be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Per Aarsleff A/S v. United States, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (internal quotation marks omitted). Under this standard, the court

> may set aside a procurement action if (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure. A court reviews a challenge brought on the first ground to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational

basis. When a challenge is brought on the second ground, the
disappointed bidder must show a clear and prejudicial violation of
applicable statutes or regulations.

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citations and internal
quotation marks omitted); see also Turner Constr. Co. v. United States, 645 F.3d 1377, 1384-85
(Fed. Cir. 2011) (explaining that reviewing courts conduct a "rational basis" review of the
agency action at issue, rather than an "independent de novo assessment"); Advanced Data
Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (observing that the
"arbitrary and capricious" standard is "highly deferential" and requires courts to sustain agency
actions that demonstrate "rational reasoning and consideration of relevant factors").

## B.  The VA Did Not Unreasonably Evaluate Plaintiff's Technical Proposal

Plaintiff argues that the weaknesses assigned to the technical portion of its proposal are
"repetitive, unsubstantiated, irrelevant, and unreasonable." Pl.'s MJAR 19. Plaintiff also
suggests that "the VA relied on unstated evaluation criteria in evaluating [plaintiff's] proposal."
Id. Defendant emphasizes that plaintiff's arguments "amount to mere disagreements with the
VA's evaluation of its technical proposal, and because the VA's evaluations were reasonable and
consistent with the [solicitation's] evaluation criteria, these arguments should be rejected."
Def.'s Cross-Mot. 14.

Proposal evaluation is "an assessment of the proposal and the offeror's ability to perform
the prospective contract successfully." FAR 15.305(a). It is well settled that government
agencies must "evaluate competitive proposals and then assess their relative qualities solely on
the factors and subfactors specified in the solicitation." Id. When an evaluation is challenged,
courts must examine the evaluation "to ensure that it was reasonable and consistent with the
evaluation criteria and applicable statutes and regulations," while remaining mindful that the
"merit of competing proposals is primarily a matter of agency discretion." E.W. Bliss Co. v.
United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (internal quotation marks omitted).

Plaintiff provides a chart listing some of its assigned weaknesses and its disagreement
with each, the substance of which is reproduced below:

| VA SSA Documents | VNT Offer |
|---|---|
| Lacked some detail in regards to how [plaintiff] will establish operations and implement work. | Detailed work plan. |
| Regarding vehicles:  Very confusing on total number of vehicles, type, and availability. | List of make and model of all vehicles. |
| The use of sedans for transportation is not optimal for elderly patients with limited mobility. | List of vehicles contains a mix of sedans, trucks, and multi-passenger vans. |
| Quote for insurance on renewal process, no proof of insurance liability.  Accord expire[d] 9/16/2017. | Copy of insurance certificates and permits as required by state law per solicitation were provided. |
| Insurance document appears to be a quote and not a current policy. | Insurance is in place. |

Pl.'s MJAR 18.  The court will address each of plaintiff's five arguments in turn.

Plaintiff's first argument merely reflects its disagreement with the VA's evaluation and does not provide any further detail.  The VA recognized that plaintiff's "work plan discussed [its] management approach (industry best practices), tools and technologies, and communication techniques" before opining that "it lacked some detail in regards to how [plaintiff] will establish operations and implement work."  AR 1845-46.  In other words, the VA did not state that plaintiff failed to include a detailed work plan; the VA merely stated that plaintiff's work plan "lacked some detail" in a specific area—its transition plan.  The evaluation criteria in the solicitation put offerors on notice that they would be evaluated, in part, on a "[d]escription (detailed work plan) of the offeror's technical solution as it relates to . . . a proposed schedule for beginning performance upon contract award."  Id. at 127.  Plaintiff provided a contract transition plan in Section 1.2.2 of its technical proposal, but has not explained how the VA's assessment of it as lacking some detail is unreasonable.  Therefore, it was not unreasonable for the VA to assess this weakness.

Plaintiff's second argument is unavailing.  While plaintiff did provide a list of the makes and models of its vehicles, its proposal was internally inconsistent regarding its vehicle fleet.  As defendant observes, the VA "provided citations to the specific pages in the proposal where these inconsistencies occur, and in its motion, [plaintiff] fails to address these inconsistencies."  Def.'s Cross-Mot. 17.  Thus, it was not unreasonable for the VA to assess this weakness.  Further, the proposal does not specify which vehicles are owned by National Mobility and which vehicles are owned by plaintiff directly.  The distinction is important since "subcontracting . . . introduces additional risk into the procurement because [plaintiff] must rely on vehicle(s) owned and

operated by a third party," AR 1846—a separate weakness that plaintiff does not contest. Ultimately, it was plaintiff's responsibility to make its proposal clear.  Therefore, the court finds plaintiff's second argument regarding its technical evaluation unavailing.

Third, plaintiff takes issue with the VA's statement that "[t]he use of sedans is not optimal for elderly patients with limited mobility," id. at 1846, and contends that its proposal includes a "[l]ist of make and model of all vehicles," Pl.'s MJAR 18.  Plaintiff further states that "[s]edans are not the primary method of transportation and nothing references their use for elderly patients.  Id.  While plaintiff is correct that its proposal does not reference the use of sedans for elderly patients, and includes a list of all vehicles, plaintiff's proposal does not explain how it would ensure that limited-mobility patients would be assigned an appropriate vehicle. Further, plaintiff's statement that sedans would not be the primary method of transportation is dubious given that half of the vehicles identified in its list are sedans.  Accordingly, it was not unreasonable for the VA to assess this particular weakness.

Fourth, plaintiff argues that it provided copies of insurance certificates and permits "per [the] solicitation," id., contrary to the VA's statement plaintiff provided a quotation and not proof of current insurance.  Defendant emphasizes that "based upon an evaluation of [plaintiff's] proposal, the assignment of this weakness was reasonable."  Def.'s Cross-Mot. 18.  Plaintiff's proposal included various insurance and permit information, as well as a statement that plaintiff was "in the process of renewing [its] insurance, and at the time of this submission [plaintiff's] broker was processing [plaintiff's] ACORD certificate."  AR 615.  Plaintiff indicated that it was providing its "insurance quote" and promised to "forward [its] certificate to the Contracting Office upon receipt."  Id.  When transmitting its proposal, plaintiff submitted four attachments— one for each volume of its proposal, and one containing its insurance certificate.  Thus, plaintiff is correct that, according to the certificate provided, its "[i]nsurance is in place."  Pl.'s MJAR 18. Mr. Thiel acknowledged, during the second GAO protest, that the certificate was overlooked and that he would not have assessed a weakness had he originally been aware of it.  However, Mr. Thiel also averred that it was not a significant weakness and would not have changed plaintiff's overall technical rating.  Even so, the assessment of the weakness itself was not unreasonable. As Mr. Thiel remarked, plaintiff did not submit its insurance certificate according to the directions contained in the solicitation.  Because the solicitation put offerors on notice that "[a]ll information pertaining to [each factor] shall be confined to the appropriate proposal volume," and such information included copies of applicable "insurance certificates," AR 123-24 (emphases added), the VA was not required to take plaintiff's insurance certificate into account, particularly given that plaintiff's proposal included a statement that plaintiff was providing a quotation in lieu of a certificate.  Further, the evaluation criteria explained that offerors would be evaluated, in part, based on providing appropriate documentation.  See ST Net, Inc. v. United States, 112 Fed. Cl. 99, 110 (2013) ("[A]n agency is not required to sift through a proposal in order to identify information that the offeror failed to include in the correct place.").  In short, the weakness assigned was in accordance with the evaluation criteria and instructions contained in the solicitation, and thus was reasonable.  To the extent that identifying the purported lack of a certificate as a weakness was unreasonable, the assessment was not prejudicial because there is no evidence that a correct assessment would have changed plaintiff's technical rating or the award of the contract to Owl.

Fifth, plaintiff asserts that the VA's statement that "[i]nsurance document appears to be a quote and not a current policy," id. at 880, reflects an error because "[i]nsurance is in place." Pl.'s MJAR 18.  Plaintiff's assertion is moot because the VA's statement was included in the original Source Selection Decision, not the Source Selection Decision following the VA's corrective action.  In any event, plaintiff's fifth assignment of error is duplicative of its fourth, and is meritless for the reasons stated in the previous paragraph.

In addition to the specific objections set forth in its chart, plaintiff contends that the weakness concerning the age of vehicles was improperly assigned because "[t]he solicitation contained no requirements concerning vehicle age."  Id. at 19.  Plaintiff is correct that the solicitation does not expressly refer to the age of vehicles.  However, the evaluation criteria described in the solicitation indicated that offerors would be evaluated in part on the "serviceability (condition)" of vehicles, the documentation provided to "verify the reliability and safety of vehicles," and the "functional Heating, Ventilation, and Air Conditioning" within the vehicle fleet.  AR 127-28.  Further, the PWS provided that the fundamental purpose of the contract was to procure "safe and comfortable . . . transportation services."  Id. at 107.  Plaintiff does not, and cannot, dispute that its proposal indicates that three of its fifteen nonambulatory vehicles are year 2000 models or older.  In the Source Selection Decision, Mr. Thiel "raise[d] a concern about the serviceability and condition of these vehicles," and noted that "[n]ewer vehicles are generally more reliable, comfortable, efficient, and safer than older vehicles."  Id. at 1846.  His concern was the functionality, not the age, of the vehicles, and thus he did not rely on unstated evaluation criteria.  In short, plaintiff fails to articulate how Mr. Thiel's concern regarding the serviceability and condition of vehicles that constituted twenty percent of plaintiff's nonambulatory fleet is unreasonable.  Therefore, plaintiff's argument concerning the age of its fleet is unavailing.

In sum, the VA's evaluation of the technical portion of plaintiff's proposal was reasonable and based on appropriate factors.

### C. The VA Did Not Unreasonably Evaluate Plaintiff's Past Performance

In addition to asserting that the VA improperly evaluated the technical portion of its proposal, plaintiff alleges that the VA improperly evaluated its past performance as a result of bias or bad faith.  Specifically, plaintiff posits that the VA failed to follow the stated evaluation criteria by not properly crediting National Mobility's past performance history, the VA relied on past performance information containing indicia of bias, and the VA's written analysis of plaintiff's past performance was disproportionately lengthy vis-à-vis the written analysis of the other offerors' past performance.

Plaintiff's first two contentions are meritless for the reasons stated above and need not be repeated.  See supra Section II.B.  Plaintiff's third contention in support of its allegation that the VA improperly evaluated its past performance is that its "seven-page past performance analysis [was] roughly three times the length of every other offeror," and thus "illustrates the effort the VA [put forth] to disqualify" plaintiff.  Pl.'s MJAR 29.  Plaintiff indicates that the Source Selection Decision contained "7 pages" of "written analysis for past performance" with respect

to plaintiff but only "2 pages" for each other offeror. Id. at 28. Plaintiff's indication is inaccurate and, in any event, misses the mark. As defendant emphasizes, "the page disparity pointed to by [plaintiff] can easily be explained by a more reasonable explanation not involving bias—the amount of past performance information for [plaintiff] versus other offerors." Def.'s Cross-Mot. 33.

Plaintiff's past performance evaluation comprised six pages of the Source Selection Decision. In composing the evaluation, Mr. Thiel began by listing plaintiff's three past performance references and discussing the relevancy of each. Then, he reviewed the only Past Performance Questionnaire that was returned from among plaintiff's three references. Next, Mr. Thiel discussed plaintiff's relevant CPARS information. He then discussed National Mobility's past performance, first by considering the relevancy of each of National Mobility's two references, and then reviewing the comments received on the Past Performance Questionnaires that each of the references returned. Finally, Mr. Thiel provided an overview of plaintiff's default termination and concluded with a summation of plaintiff's past performance rating of "Limited Confidence."

Mr. Thiel's evaluation of Owl's past performance comprised three pages of the Source Selection Decision. Similar to plaintiff's past performance evaluation, he listed Owl's past performance references and discussed their relevancy, reviewed Owl's relevant CPARS information, noted that Owl proposed no subcontractors or other teaming arrangements, observed that there were no default terminations, and concluded with a summation of Owl's "Substantial Confidence" rating. None of Owl's references returned a Past Performance Questionnaire.

The other past performance evaluations followed a similar track. Offeror B's past performance evaluation comprised two pages; no CPARS information, subcontractor information, or past default termination was on file, and only one Past Performance Questionnaire was returned. Offeror C's past performance evaluation comprised approximately three pages of the Source Selection Decision and contained CPARS information, but there were no Past Performance Questionnaires returned, no subcontractors or other teaming arrangements proposed, and no default terminations. Offeror D's past performance evaluation also comprised three pages and contained CPARS and subcontractor information, but no Past Performance Questionnaires or default terminations. Finally, Offeror F's past performance evaluation comprised approximately two pages, containing one Past Performance Questionnaire, CPARS summary information but no comments, no details regarding subcontractors, and no default terminations.

In other words, the VA's past performance evaluations followed the same process for each offeror. Importantly, the discussions were substantially similar in nature; there was simply more relevant information with respect to plaintiff. Indeed, agencies "shall consider [past performance references], as well as information obtained from any other sources, when evaluating the offeror['s] past performance." FAR 15.305(a)(2)(ii). Thus, it would have been arbitrary and capricious for the VA not to consider the available past performance information concerning plaintiff—particularly because plaintiff misrepresented its past performance by

stating that it had no prior default terminations and met 100% of its objectives on prior contracts. Plaintiff's apparent disagreements regarding the relevance of this information are of no moment. Because determining the relevance of past performance information is a matter of agency discretion, such decisions are entitled to deference.  Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 718 (2010).  There is no reason to question Mr. Thiel's determinations of relevance concerning the past performance information for any of the offerors.  Accordingly, the variances in length among the offerors' past performance evaluations are not unreasonable and provide no basis for finding that any of the past performance evaluations were improper.

In short, plaintiff has not met its burden of showing that the VA's past performance evaluations were the result of bias or bad faith or were otherwise improper.

### D.  The VA Did Not Fail to Properly Analyze the Offerors' Proposed Prices

Plaintiff also alleges that the VA's evaluation of its proposal was flawed because the VA did not properly evaluate prices.  Specifically, plaintiff contends that "[t]he VA should also have evaluated the price reasonableness of offers based on SCA wage rates in the solicitation," Pl.'s MJAR 28, and suggests (without support) that Owl "did not take [SCA] rates into consideration in its proposal," id. at 29 n.9.  Defendant responds that the solicitation "plainly did not require" a "price realism analysis supporting SCA wages."  Def.'s Cross-Mot. 35.

By effectively arguing that the VA should have determined whether Owl's proposed price is unrealistically low, plaintiff actually invokes price realism rather than price reasonableness:

> [A] price reasonableness analysis has the goal of preventing the government from paying too much for contract work.  A price realism analysis, on the other hand, investigates whether the contractor is proposing a price so low that performance of the contract will be threatened.

DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 657 n.5 (2010).  The solicitation provided that the VA could "determine that an offer [was] unacceptable if the option prices are significantly unbalanced," AR 129.  Therefore, offerors were on notice that price analysis would be conducted.  However, plaintiff fails to identify any language in the solicitation expressly or impliedly requiring the VA to conduct a price realism analysis.  See UnitedHealth Military & Veterans Servs., LLC v. United States, 132 Fed. Cl. 529, 554-55 (2017) (providing examples of language that has been deemed to require agencies to conduct a price realism analysis in the absence of an express directive in the solicitation).  Conducting a price realism analysis "[i]n situations where the solicitation does not expressly or implicitly require a price realism analysis" would be an improper use of unstated evaluation criteria.  Ceres Envtl. Servs., Inc. v. United States, 97 Fed. Cl. 277, 306 (2011).  Accordingly, the VA could not have performed the analysis that plaintiff suggests without running afoul of the FAR.  To the extent that plaintiff believes such an analysis should have been conducted, plaintiff has waived that objection by not challenging the terms of the solicitation in a preaward bid protest.  See Blue & Gold Fleet, L.P.

v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (providing that contractors who have the opportunity to object to the terms of a solicitation, but fail to do so, are precluded from later raising such objections in a bid protest).

The VA did, however, perform a price reasonableness analysis pursuant to the terms of the solicitation and the FAR.  Agencies may "use various price analysis techniques and procedures to ensure a fair and reasonable price," including "[c]omparison of proposed prices received in response to the solicitation" and "[c]omparison of proposed prices with [IGEs]." FAR 15.404-1(b)(2)(i), (v).  As described above, the VA analyzed price reasonableness by comparing the offerors' proposed prices to one another rather than the IGE (since the IGE was undervalued).  See Serco Inc. v. United States, 81 Fed. Cl. 463, 494 (2008) ("[A]n agency may conclude that an awardee's price is reasonable if it is consistent with the prices received from various competitors . . . .").  Therefore, the VA's price reasonableness inquiry was not improper.

### E.  The VA's Best-Value Tradeoff Analysis Was Not Improper

Finally, plaintiff asserts that the VA "failed to perform the best-value analysis required by the solicitation."  Pl.'s MJAR 29.  Plaintiff supports its assertion by stating that the VA's technical, past performance, and price evaluations were each flawed.  Plaintiff's reasoning is meritless for the reasons stated above, which need not be repeated.  See supra Sections III.B (technical), III.C (past performance), III.D (price).  In addition, plaintiff has not carried its burden of demonstrating bias or bad faith.

Under FAR 15.308, a best-value tradeoff must be "based on a comparative assessment of proposals against all source selection criteria in the solicitation."  The solicitation provided that proposals would be evaluated based on the following three factors, in descending order of importance:  technical capability, past performance, and price.  As the Source Selection Authority, Mr. Thiel determined that because Owl received the "highest combined rating for the Technical and Past Performance factors out of all offerors eligible for contract award," and also proposed the lowest price, Owl's proposal "represent[ed] the best value offer" to the VA in response to the solicitation.  AR 1859.  Even if plaintiff's Technical Capability rating had been Very Good (one level higher) and its Past Performance rating had been Substantial Confidence (three levels higher), the VA's best-value award to Owl would stand because plaintiff's proposed price was $1.3 million higher.

Best-value tradeoffs are appropriate "when it may be in the best interest of the Government to consider award to other than the lowest priced offeror or other than the highest technically rated offeror."  FAR 15.101-1(a).  Here, Owl was both, and thus no comparative tradeoff was necessary.  Further, Mr. Thiel's determinations regarding each offeror were supported by detailed narratives, were not unreasonable or the product of bias or bad faith, and were consistent with the evaluation criteria described in the solicitation.  Courts are generally loathe to "disturb a best-value award so long as the agency documents its final award decision and includes the rationale for any business judgments and tradeoffs made," Afghan Am. Army Servs. Corp. v. United States, 90 Fed. Cl. 341, 360 (2009), and the court similarly declines to do so here.

### F.  Plaintiff Is Not Entitled to Injunctive Relief

In sum, plaintiff has not established that the VA's award of the new contract to Owl was improper.  Accordingly, plaintiff is not entitled to injunctive relief.  See PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (explaining that a plaintiff "must [have] succeeded on the merits of the case" in order to be granted permanent injunctive relief); Career Training Concepts, Inc. v. United States, 83 Fed. Cl. 215, 219 (2008) (collecting cases for the proposition that "a permanent injunction requires actual success on the merits").

## IV.  CONCLUSION

The court has considered all of the parties' arguments.  To the extent not discussed herein, they are unpersuasive, without merit, or are unnecessary for resolving the matters currently before the court.

Discovery is not warranted because plaintiff has failed to make its threshold showing of bias or bad faith and the administrative record as currently constituted is sufficient for effective judicial review.  Further, the VA evaluated proposals according to the criteria set forth in the solicitation and sufficiently explained its reasoning.  Plaintiff has failed to show that the award decision was arbitrary, capricious, an abuse of discretion, contrary to law, the product of bias or bad faith, or otherwise improper.  Because plaintiff has not succeeded on the merits of its protest, it is not entitled to a permanent injunction.

Therefore, the court **DENIES** plaintiff's motion for discovery, **DENIES** plaintiff's motion for judgment on the administrative record, and **GRANTS** defendant's motion for judgment on the administrative record.  No costs.  The clerk is directed to enter judgment accordingly.

[. . .]

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge